In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-390 CV


____________________



RICHARD AARON TINNELL AND LAURA TINNELL, Appellants



V.



POULSON CUSTOM HOMES, INC., Appellee






On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 05-09-08014 CV






 MEMORANDUM OPINION


 This dispute arose from the construction of a home. The homeowners, Richard Aaron
Tinnell and Laura Tinnell, sued their contractor, Poulson Custom Homes, Inc., seeking to be
reimbursed for carpeting they paid to have installed in their home and to recover damages
for allegedly defective work. Poulson denied that it owed the Tinnells for the carpeting or
damages and alleged that the Tinnells owed Poulson for extras they ordered during the
home's construction and for lumber that Aaron took from the worksite. After a bench trial,
the trial court awarded damages to Poulson on its claims and found against the Tinnells on
their claims. In addition, the court awarded Poulson interest, court costs, and attorney's fees. 
The trial court entered findings of fact and conclusions of law in support of its judgment. We
affirm. 

I. BACKGROUND


 After negotiations, Poulson and the Tinnells entered into a written construction
agreement for Poulson to construct the Tinnells' new home for $202,541, pursuant to certain
building specifications. The agreement contained a clause requiring the Tinnells to order any
construction changes or deviations in writing and requiring Poulson to present any increases
in the cost of the work to the Tinnells in writing and to obtain their written approval before
proceeding with any changes. 

Upgrades


 During construction, the Tinnells orally requested various extras and upgrades that the
trial court found were not part of the written contract, including ones related to: (1) the air
conditioning system, (2) master bedroom ceiling, (3) doors in the study, (4) master shower,
(5) kitchen cabinets, (6) additional dirt work, (7) appliances, (8) lighting fixtures, (9)
additional concrete overages, (10) sheetrock texture and corners, (11) wall paint, and (12)
exterior paint. Poulson charged $24,275 for the changes and upgrades. While the parties
agree that Poulson made the changes and the upgrades, they disagree about whether, with
respect to the claimed extras, the Tinnells were required to pay additional consideration for
them. The Tinnells contend they were not required to pay because the parties did not strictly
follow the written terms of the contract for the changes.

Currier Carpet


 The construction agreement included an $11,000 allowance for tile and flooring. 
Poulson paid a subcontractor $3,363 for tile work, which left $7,637 of the allowance
available for additional tile or flooring. The trial court found that the Tinnells subsequently
contracted with and paid Currier Carpet to install additional flooring material in the home.
The trial court further found that (1) there was no agreement that Poulson would pay Currier
Carpet, and (2) Poulson credited the remaining flooring allowance against the upgrades the
Tinnells had received.

Lumber


 The trial court found that Aaron took lumber from the jobsite without Poulson's
permission. The court further found that (1) Poulson replaced lumber worth $1,847.08 to
complete work on the house, and (2) Tinnell took lumber worth $3,155.92 that Poulson could
have returned to its lumber supplier for credit. The trial court found the total value of the
lumber taken to be $5,003. While Aaron contended he had permission to remove lumber
from the site, he does not attack the trial court's findings regarding the value of the lumber
in question. 


Judgment and Findings of Fact


 After a bench trial, the trial court entered its final judgment in Poulson's favor,
awarding Poulson $18,995 for upgrades, $5,003 for converted lumber, and $30,000 in
attorney's fees, plus costs and interest. The final judgment awarded no relief to the Tinnells
on their claims. Subsequently, the Tinnells requested that the trial court file findings of fact
and conclusions of law. The court entered fifty-one findings of fact and seventeen
conclusions of law in support of its judgment. 

II. ISSUES


 The Tinnells raise six appellate issues. The first three issues challenge the legal and
factual sufficiency of the evidence supporting Poulson's recovery of damages under its
claims for breach of contract, quantum meruit, and conversion. In the last three issues, the
Tinnells claim that (1) the great weight of the evidence supports their claim that Poulson
breached the construction contract, (2) the trial court erred in denying their post-trial motion
to amend their pleadings to assert a claim for misappropriation of funds, and (3) the trial
court erred in granting Poulson's directed verdict on their deceptive-trade-practices claims.

III. STANDARDS OF REVIEW


 In an appeal from a bench trial, the trial court's findings of fact "have the same force
and dignity as a jury's verdict upon questions." Anderson v. City of Seven Points, 806
S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and
factual sufficiency of the evidence to support them by the same standards that are applied in
reviewing evidence supporting a jury's answer. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.
1996); Anderson, 806 S.W.2d at 794. When the trial court's findings are unchallenged by
complaint on appeal, they are binding on the appellate court unless the contrary is established
as a "matter of law" or there is "no evidence" to support the finding. McGalliard v.
Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Wade v. Anderson, 602 S.W.2d 347, 349 (Tex.
Civ. App.-Beaumont 1980, writ ref'd n.r.e.) ("Unless the trial court's findings are challenged
by a point of error on appeal, they are binding upon the appellate court.").

 Our review of unchallenged findings is confined to whether the evidence is legally
sufficient to support them. See McGalliard, 722 S.W.2d at 696; see also Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 241 (Tex. 2001) (explaining that the "matter of law" legal-sufficiency standard applies when adverse findings are challenged by a party who, for the
finding in issue, had the burden of proof); Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.
1983) (explaining that the "no evidence" legal-sufficiency standard applies when an adverse
finding is challenged by an appellant who did not have the burden of proof for the finding). 

 Generally, attacks on the sufficiency of the evidence supporting findings of fact 
"must be directed at specific findings of fact, rather than at the judgment as a whole."
Arrellano v. State Farm Fire & Cas. Co., 191 S.W.3d 852, 855 (Tex. App.-Houston [14th
Dist.] 2006, no pet.) (citing Zagorski v. Zagorski, 116 S.W.3d 309, 319 (Tex. App.-Houston
[14th Dist.] 2003, pet. denied)); see also 6 Roy W. McDonald & Elaine Grafton
Carlson, Texas Civil Practice § 18:12 (2d ed. 1998). Evidence is legally sufficient if it
"would enable reasonable and fair-minded people to reach the verdict under review." City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). In evaluating the evidence's legal
sufficiency, "we credit evidence that supports the verdict if reasonable jurors could, and
disregard contrary evidence unless reasonable jurors could not." Kroger Tex. Ltd. P'ship v.
Suberu, 216 S.W.3d 788, 793 (Tex. 2006) (citing City of Keller, 168 S.W.3d at 827); see Am.
Interstate Ins. Co. v. Hinson, 172 S.W.3d 108, 114 (Tex. App.-Beaumont 2005, pet. denied). 
In addition, the trial court as factfinder determines the credibility of the witnesses and the
weight to be given their testimony. McGalliard, 722 S.W.2d at 697; see City of Keller, 168
S.W.3d at 819.

IV. ISSUE ONE


 In issue one, the Tinnells assert that the evidence is legally and factually insufficient
to show they breached their contract with Poulson. (1) Poulson responds that sufficient
evidence supports the trial court's findings that the Tinnells entered into separate oral
contracts with Poulson for upgrades and extras and that the Tinnells breached these oral
contracts. 

 Because the Tinnells do not attack the trial court's specific findings, we review the
legal sufficiency of the evidence supporting the unchallenged findings. See McGalliard, 722
S.W.2d at 696. As Poulson had the burden of proof on its breach of contract claim, the
unchallenged findings are binding on us unless there is "no evidence" to support them. See
McGalliard, 722 S.W.2d at 696; Croucher, 660 S.W.2d at 58.

 Under issue one, the Tinnells argue that Poulson had no right to recover for any
upgrades because Poulson did not secure their written approval before it performed the
additional work. In addition, the Tinnells contend that the upgrades did not constitute extra
work under the parties' written agreement.

 Poulson, on the other hand, asserts that the Tinnells understood the scope of work that
was to be performed under the written agreement and understood they would be required to
pay additional consideration for items or services not included in the contract's specifications
or design plans. Poulson also asserts that during the home's construction, the Tinnells
demanded upgrades and extra work. Poulson asserts that its claims for additional
consideration for all extra work were supported by separate oral contracts. 

 At the Tinnells' request, the trial court filed findings of fact and conclusions of law. (2)
Among the trial court's findings were the following: (a) Poulson built the house the Tinnells
wanted, including all later-added upgrades; (b) during construction, the Tinnells demanded
extras and upgrades not included in the contract; (c) the Tinnells knew if they requested and
received items and services not included in the contract, they would have to pay for those
items or services; (d) prior to doing any upgrades or extra work, the subcontractors and the
Poulson representative informed the Tinnells that they were demanding work in addition to
what was provided in the contract and also informed the Tinnells of the additional costs
involved; and (e) the Tinnells knowingly accepted the upgrades and extras and promised to
pay Poulson for all upgrades and extras. The Tinnells do not specifically challenge these
findings. 

 Testimony at trial showed that Poulson and its subcontractors complied with the
Tinnells' oral requests for extras and upgrades. Dennis Gau, an employee of Poulson Homes,

negotiated the construction contract with the Tinnells. At trial, he identified exhibit 16 as the
"change order" containing all of the changes and upgrades made to the Tinnells' home. Gau
testified that the Tinnells were aware they would have to pay for these changes and that they
agreed to do so. Gau also testified that a disagreement about an upgrade for the sheetrock
texture caused Poulson to temporarily stop construction on the Tinnells' home. Gau had
explained to Laura that the texture she requested would be an upgrade. According to Gau,
Aaron wanted the texture upgrade "for free," and the Tinnells threatened to sue if Poulson
did not provide the upgrade without additional charge. Gau explained that he told the
Tinnells he could not provide "things for free" and Poulson stopped construction. Gau
further testified that Aaron subsequently told him to "do the texture the way my wife wants
and I'll pay you for it, just put it on a change order." Gau's testimony about the texture
upgrade, as well as other extras, supports the trial court's findings that the Tinnells: (1)
requested upgrades not included in the contract, (2) knew they would have to pay extra for
them, (3) were informed of extra costs by the contractor or subcontractor before the upgrades
were provided, and (4) knowingly accepted the upgrades and promised to pay for them. 

 Kevin Bryan, vice president of Air Champion, which was a Poulson subcontractor for
the Tinnell house, testified about Aaron's requested changes to the air-conditioning system.
Bryan explained to Aaron that the change he requested to the air-conditioner damper system
was an upgrade and would cost additional money. Aaron told Bryan to "go ahead" with the
change. Thus, Bryan's testimony further supports the trial court's findings related to
Poulson's breach of oral contract claims. 

 Scott Lowe, an employee of Keystone Concrete, testified that he supervised the
concrete work at the Tinnell home. Lowe further testified that Aaron Tinnell requested that
the driveway be made substantially larger than the one Poulson instructed him to build. 
Lowe told Aaron that anything over what was allowed in the contract would cost more and
that Aaron understood there would be extra charges for the changes he wanted. Lowe's
testimony provides additional support for the trial court's findings regarding Poulson's
breach of oral contract claims. 

 After initially denying that the Tinnells requested any changes or upgrades, Aaron
Tinnell testified they only requested a single change, one that involved the sheetrock texture. 
Aaron admitted requesting that change after direct questions from the trial court. (3) While
Aaron acknowledged receiving faxes from Poulson stating that the Tinnells were over
budget, he testified that he considered any overage to be Poulson's problem. Aaron also
testified that he understood the house was a "turnkey" project based on a $202,000 price. 

 Gau, the Poulson representative, denied that he and the Tinnells ever discussed
"capping" the price of the home at $202,000. Gau testified that when going through the
contract with the Tinnells, he explained how the allowances would work. Gau stated that he
had no doubt the Tinnells understood they would have to pay the costs associated with
exceeding a contract allowance. 

 If based on this evidence, reasonable and fair-minded persons could conclude that
the Tinnells breached oral contracts with Poulson, the evidence is legally sufficient. See City
of Keller, 168 S.W.3d at 827. When conducting our review, we credit evidence favorable
to the verdict if a reasonable factfinder could, and disregard unfavorable evidence unless a
reasonable factfinder could not. See Suberu, 216 S.W.3d at 793; Hinson, 172 S.W.3d at 114. 

 To prevail on a breach of contract claim, a plaintiff must show that: (1) a valid
contract exists, (2) the plaintiff performed or tendered performance, (3) the defendant
breached the contract, and (4) the breach damaged the plaintiff. Trahan v. Fire Ins. Exch.,
179 S.W.3d 669, 674 (Tex. App.-Beaumont 2005, no pet.); Critchfield v. Smith, 151 S.W.3d
225, 233 (Tex. App.-Tyler 2004, pet. denied) (oral contract). Parties form a valid contract
"when an offer is made and accepted, when there is a meeting of the minds, and when the
terms are sufficiently certain to define the parties' obligations." Tex. Disposal Sys. Landfill,
Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 589 (Tex. App.-Austin 2007, pet.
denied) (citing Copeland v. Alsobrook, 3 S.W.3d 598, 604 (Tex. App.-San Antonio 1999,
pet. denied)). "The determination of a meeting of the minds, and thus offer and acceptance,
is based on the objective standard of what the parties said and how they acted, not on their
subjective state of mind." Id.

 Poulson relies on Buxani v. Nussbaum, 940 S.W.2d 350 (Tex. App.-San Antonio
1997, no writ), to support its breach of oral contract claim and the trial court's findings in its
favor. In Buxani, the owners of a jewelry store had a written agreement with a contractor
who was to remodel their store. Id. at 351. Similar to paragraph 6 of the Tinnell contract,
the Buxani contract contained a provision that stated: "Any alteration or deviation from
above specifications involving extra costs will be executed only upon written orders, and will
become an extra charge over and above the estimate." Id. Although the written contract
required changes to be in writing, the Buxani Court held the evidence sufficient to show that
the owners "assented to the terms of the oral agreement through their conduct; they allowed
the items to be installed and the services to be performed without objecting to anything until
the time for payment arrived." Id. at 352. The court also observed: "In a contract implied
in fact, which is the same as an express contract except for the manner of proof, the element
of mutual assent can be inferred from the circumstances of the transaction." Id. The Buxani
Court concluded that the evidence supported the existence of an oral contract and affirmed
the trial court's judgment because the owners breached the oral contract under which they
agreed to pay for the changes they had ordered. Id. at 353.

 Disregarding a term of a written contract requiring that extra work be authorized in
writing may result in a finding of waiver. Id. at 352. Poulson pled that the Tinnells waived
the contract's requirement that change orders be in writing. The trial court did not make any
specific findings on waiver. However, when a trial court makes findings of fact on some
elements that support its judgment, but omits findings on other grounds, the appellate court
presumes the trial court made the omitted findings in support of the judgment when those
presumed findings are supported by the evidence at trial. Tex. R. Civ. P. 299; Buxani, 940
S.W.2d at 352. 

 In this case, the testimony from Gau, Bryan, and Lowe is legally sufficient to support
the trial court's unchallenged findings supporting Poulson's breach of oral contract claim.
These findings establish that : (1) the Tinnells demanded extras and upgrades not included
in the contract, (2) the Tinnells knew they would have to pay for these items or services, (3)
prior to doing any upgrades or extra work, the contractor or subcontractors informed the
Tinnells that they were demanding work in addition to what was provided in the contract and
also informed the Tinnells of the additional costs involved, and (4) the Tinnells knowingly
accepted the upgrades and extras and promised to pay Poulson for them. These findings
satisfy the necessary elements to show valid oral contracts between the Tinnells and Poulson:
offer and acceptance, meeting of the minds, and sufficiently certain definition of the parties'
obligations. See Tex. Disposal Sys., 219 S.W.3d at 589. 

 Moreover, the testimony about the circumstances under which Poulson proceeded
with the extra work is sufficient to support the trial court's implied finding that the Tinnells
waived the contract's written term requiring change orders to be in writing. There was also
testimony that supported the trial court's specific finding that the Tinnells approved the extra
work items before the builder proceeded with the changes or revisions. See Buxani, 940
S.W.2d at 352. Gau testified that trial exhibit 16 was a list of the upgrades provided to the
Tinnells, that they were aware they had to pay for these upgrades, and that they had agreed
to do so. At first, Aaron agreed that items Poulson contended were extra work were actually
incorporated into his home but then disputed whether Poulson used eggshell paint in the
house. Even Aaron, at one point in his testimony, acknowledged being notified of some of
the changes before Poulson's subcontractors performed additional work. While there are
conflicts in the testimony between the witnesses on whether Aaron was notified of the
eggshell paint upgrade, the trial court determines which of the witnesses to believe and what
parts of their testimony are credible. See McGalliard, 722 S.W.2d at 697; see also City of
Keller, 168 S.W.3d at 819. Thus, we find the evidence legally sufficient to show that valid
oral contracts existed with respect to the changes and upgrades at issue between the Tinnells
and Poulson. 

 We next consider whether the evidence is legally sufficient to support the trial court's
unchallenged findings regarding the remaining elements of a breach of contract claim:
performance by Poulson, breach by the Tinnells, and damages suffered by Poulson. See
Trahan, 179 S.W.3d at 674. The trial court found that Poulson provided the upgrades to the
Tinnells' home and that the Tinnells still owed Poulson for the upgrades. These findings are
supported by Gau's testimony that all of the upgrades included in trial exhibit 16 were
provided to the Tinnells; the exhibit further shows the total amount owed by the Tinnells.
The trial court found that Poulson's damages were $18,995. (4) The amount of damages also
is supported by Gau's testimony and exhibit 16.

 In conclusion, we find that a reasonable and fair-minded factfinder could have
determined that Poulson should recover on its breach of oral contract theory. See City of
Keller, 168 S.W.3d at 827. Thus, we find the evidence legally sufficient to support Poulson's
recovery and overrule issue one.

 Quantum Meruit


 Because the trial court found that the Tinnells entered into oral contracts on the extra
work claims, and we have found the evidence sufficient to support Poulson's breach of
contract claim, we need not determine whether there is legally and factually sufficient
evidence to support Poulson's quantum meruit claim for extras and upgrades. Thus, we do
not consider issue two. See Tex. R. App. P. 47.1.

V. ISSUE THREE


 In issue three, the Tinnells contend there is no evidence or insufficient evidence to
prove that Aaron removed lumber from the jobsite and converted it to his own use. Poulson
argues that the evidence clearly shows that Aaron converted Poulson's lumber.

 At trial, the court heard testimony about the alleged conversion. Aaron admitted using
some wood to build a workbench in his garage but initially testified that he had Gau's
permission to do so. During his cross-examination, however, Aaron agreed that he
"assumed" when he was giving his deposition that he had Gau's permission to use the wood
rather than conveying that Gau explicitly gave him permission to do so. At trial, Aaron also
admitted loading lumber onto a trailer but contended he did not take the lumber from the
jobsite. Rather, according to Aaron, the lumber "ended up behind the garage or in the garage
for the work bench that [he] built." 

 On Poulson's behalf, Gau testified that he never gave Aaron permission to take
lumber from the worksite. Gau further testified that on the night Aaron took Poulson's
lumber, Aaron called him to find out if he planned to inspect the site that evening. Shortly
after Aaron called, one of Poulson's subcontractors called Gau and reported that someone
was stealing lumber from the worksite. After the subcontractor described the alleged thief's
vehicle, Gau recognized it as Aaron's and immediately called him. Aaron confirmed he was
taking lumber but contended it was only scrap lumber. Gau further testified that his
workmen were unable to do their job on the following day because the lumber they needed
was gone. According to Gau, he purchased additional cornice materials in the amount of
$1,847.08 because Aaron removed the lumber from the site. Gau also said that Poulson was
unable to return over $3,000 of unused lumber to its supplier because Aaron also took that
lumber from the site. Gau testified that Poulson's supplier would have credited Poulson's
account for the returned lumber and that Poulson lost a total of $5,003, which Gau attributed
to Aaron's removal of lumber from the site. 

 The Tinnells do not specifically attack any of the trial court's findings of fact that
relate to Poulson's conversion claim. See Arrellano, 191 S.W.3d at 855. Because Poulson
had the burden of proof on its conversion claim and the Tinnells do not specifically challenge
the trial court's findings, the trial court's unchallenged findings are binding on appeal unless
no evidence supports them. See McGalliard, 722 S.W.2d at 696; Croucher, 660 S.W.2d at
58. 

 "Conversion is defined as the wrongful exercise of dominion and control over
another's property in denial of or inconsistent with [the owner's] rights." Green Intern., Inc.
v. Solis, 951 S.W.2d 384, 391 (Tex. 1997). The trial court found that: (a) Aaron took or
used lumber from the jobsite; (b) Gau never gave Aaron permission to use or take any lumber
from the jobsite; (c) Aaron testified that there were "hundreds" and "thousands" of pieces
of lumber measuring 8, 10, and 12 feet in length, and that he took such pieces from the
jobsite; (d) because so much lumber was taken, the cornice work on the house was delayed;
(e) the value of the stolen lumber that Poulson had to replace was $1,847.08; (f) Aaron took,
without permission, an additional $3,155.92 in lumber that Poulson would have returned to 
the lumber supplier for credit; and, (g) the total value of lumber taken by Aaron without
permission was $5,003.

 The trial court's findings, if supported by legally sufficient evidence, establish that
Aaron wrongfully exercised control over Poulson's property in a manner that was
inconsistent with Poulson's rights. See Solis, 951 S.W.2d at 391; McGalliard, 722 S.W.2d
at 696. We find that Gau's testimony provides legally sufficient evidence to support the trial
court's findings because his testimony would enable reasonable and fair-minded people to
reach the verdict under review. See City of Keller, 168 S.W.3d at 827. Further, the court
may disregard Aaron's contrary testimony because reasonable jurors could do so. See
Suberu, 216 S.W.3d at 793. While a factfinder is generally free to make credibility
assessments about a witness's testimony even if it is free from inconsistency, it is certainly
within the factfinder's discretion to disregard a witness's testimony that is inconsistent with
the witness's prior testimony under oath. See McGalliard, 722 S.W.2d at 697; see also City
of Keller, 168 S.W.3d at 819. Aaron's testimony about whether he had Gau's permission to
take the lumber was inconsistent. Because the trial court determines credibility of testimony
and there was sufficient evidence supporting the required elements of conversion, we
overrule issue three.

VI. ISSUE FOUR


 In issue four, the Tinnells challenge the factual sufficiency of the evidence supporting
the trial court's finding that Poulson did not breach the construction contract. The Tinnells
claim Poulson breached the contract by failing to pay Currier Carpet for the flooring and by
allegedly charging the Tinnells for a septic system installed at another location. Because
these are claims for which the Tinnells had the burden of proof, we determine if the evidence
is factually sufficient by applying the "great weight and preponderance" standard. See
Francis, 46 S.W.3d at 242.

Currier Carpet


 The trial court found there was no agreement that Poulson would pay Mike Currier
or Currier Carpet for the installation of flooring at the Tinnells' home. Three witnesses
presented testimony on this issue-Gau, the Poulson representative; Aaron; and Mike Currier,
the owner of Currier Carpet. 

 The testimony of Gau and Aaron is contradictory. Gau testified that he never
contracted with Currier Carpet to install flooring in the Tinnells' home. Aaron, however,
testified that Gau hired Currier to install the carpet and wood floors. 

 The testimony of Currier, the owner of Currier Carpet, likewise failed to show that
Currier had a contract with Poulson. Currier testified that his friend Aaron asked him to "do
the flooring" in the Tinnells' new home. Currier also testified that after he talked to Gau,
Currier gave his bid to Aaron. According to Currier, Gau never negotiated the price with
Currier. Instead, Aaron told Currier that Gau thought the price was too high. Currier also
testified that he did not know if Poulson ever agreed to his proposal. Currier further
conceded that neither Poulson nor Gau ever signed his bid proposal to indicate that Poulson
accepted his proposal. Currier testified that when he was out of town, he called the Tinnells,
rather than Poulson, to arrange for an advance for Currier's flooring work. After the work
was completed, Currier sent a bill to Poulson and sent a copy of the bill to Aaron. When
Poulson did not pay Currier's bill, he filed a lien on the home, and Aaron ultimately paid
Currier a total of $7,800.

 At best, the testimony is conflicting as to whether Poulson agreed to pay Currier for
flooring installation. The trial court may not have believed Aaron's testimony but may have
believed Gau's, and, as factfinder, was free to do so. See City of Keller, 168 S.W.3d at 827. 
The additional evidence offered by Currier does not show that Poulson agreed to pay for
Currier's flooring. Thus, the Tinnells have failed to show that the trial court's "no
agreement" finding is against the great weight and preponderance of the evidence. See
Francis, 46 S.W.3d at 242.

 Septic System
 

 The trial court did not make specific fact findings regarding the Tinnells' contention
that they were charged for two septic systems, rather than one. The court, however, 
concluded that Poulson did not breach the contract and that Poulson was not liable to the
Tinnells under any of their claims. 

 The Tinnells contend that Gau paid for both theirs and his mother's septic system with
a check drawn from funds for the Tinnells' project. As support, the Tinnells refer to Gau's
testimony on cross-examination as follows: 

 [Appellants' counsel]: And check stub number 2056 is a check for 8,700
dollars paid to Bullseye Construction. Says
"septic at Tinnells' and mom's." Is that correct?


 [Gau]: That's correct.


 [Appellants' counsel]: All right. So, you did not segregate the funds that
were going to pay for the expenses to build the
Tinnells' house and keep them separate from the
funds that were going to build your mother's
house, did you?


 [Gau]: No. Like I said, if that was taken out of the
Tinnell home, it would have been taken out of the
profit.


 However, Gau also testified that his mother's septic system was not billed to the
Tinnells. He explained that his "septic guy did two septic systems for me in that particular
pay period and I put both of them on one invoice, which I paid for with my money, out of my
checking account."

 When the trial court has not made a specific finding pertinent to an issue, we presume
it made fact findings in support of its judgment. See Tex. R. Civ. P. 299; Buxani, 940
S.W.2d at 352. Here, we presume the court found no breach of contract occurred regarding
the Tinnells' claim that they were charged for two septic systems. 

 Gau testified that he did not bill the Tinnells for the extra septic system. While the
funds for the Tinnells' home were placed in Poulson's construction account, the record is not
clear whether the construction account contained only funds for the construction of the
Tinnells' home. Further, in their arguments under issue four, the Tinnells fail to provide us
with record cites to any evidence that contradicts Gau's testimony or that proves that their
funds were used to pay for the other septic system, and we did not find any in our review of
the record. Therefore, we find that the evidence presented at trial regarding the septic system
does not show that the trial court's presumed finding on that issue is against the great weight
and preponderance of the evidence. See Francis, 46 S.W.3d at 242. 

 Because the evidence is factually sufficient to support the trial court's findings and
presumed findings regarding the Tinnells' claim that Poulson breached the construction
contract, we overrule issue four.


VII. ISSUE FIVE


 In issue five, the Tinnells contend the trial court abused its discretion when it denied
their post-trial motion to amend their original petition to include a cause of action for
misappropriation of trust funds. The Tinnells rely on section 162.003 of the Texas Property
Code as the basis for their misappropriation claim. See Tex. Prop. Code Ann. § 162.003
(Vernon 2007). The Tinnells contend that under the Property Code, Poulson owed them a
statutory duty that it breached by paying for more than one septic system from its
construction account. 

 Relying on Rule 67 of the Texas Rules of Civil Procedure, the Tinnells argue that the
parties tried the issue by consent. See Tex. R. Civ. P. 67. Rule 67 provides, in part, that if
"issues not raised by the pleadings are tried by express or implied consent of the parties, they
shall be treated in all respects as if they had been raised in the pleadings." Id. The Tinnells
maintain the trial court should have awarded them damages in the amount of $4,350, plus
interest and attorney's fees. 

 "The rule of trial by implied consent is only intended to apply to exceptional cases
where it clearly appears from the record the parties tried the unpleaded issue by consent. It
is a rule that should be applied with care and not in a doubtful situation." White v. Sullins,
917 S.W.2d 158, 160-61 (Tex. App.-Beaumont 1996, writ denied) (citations omitted). 
Further, if "evidence relevant to both a pleaded and an unpleaded issue has been admitted
without objection, the doctrine of trial by consent should not be applied unless clearly
warranted." Compass Bank v. MFP Fin. Servs., Inc., 152 S.W.3d 844, 854 (Tex.
App.-Dallas 2005, pet. denied); see Johnston v. McKinney Am., Inc., 9 S.W.3d 271, 281
(Tex. App.- Houston [14th Dist.] 1999, pet. denied). 

 The Tinnells cite Gau's explanation about the receipt of one invoice for two septic
systems and Gau's explanation about how he paid for both out of Poulson's construction
account to support their contention that the cause was tried by consent. However, Gau's
explanation about the septic charges was also relevant to the Tinnells' breach of contract
claim, in which they asserted that Gau breached the contract by billing them for two septic
systems instead of one. 

 Thus, because the evidence cited by the Tinnells was relevant on an issue they pled, 
the record as a whole does not show that Poulson should have known that the Tinnells
intended to try an issue regarding misappropriation of trust funds. (5) Consequently, we cannot
say that the trial court abused its discretion in denying the Tinnells' request to allow a trial
amendment. See White, 917 S.W.2d at 161. We overrule issue five. 

 VIII. ISSUE SIX


 In issue six, the Tinnells allege that the trial court erred in granting a directed verdict
on their Texas Deceptive Trade Practices Act (DTPA) claims. See Tex. Bus. & Com. Code
Ann. §§ 17.41-.63 (Vernon 2002 & Supp. 2007). The Tinnells' trial pleadings alleged they
were entitled to multiple damages under section 17.50(b)(1) of the DTPA for Poulson's
deceptive trade practices that were committed "knowingly" and "intentionally." (6)

 The Tinnells argue that Poulson engaged in deceptive trade practices by representing
that it would build the house for $202,541.00 and then seeking to charge the Tinnells for
extras. The Tinnells' appellate brief states: "Gau made numerous representations knowing
that they were false and deceptive. The first and most obvious one being the representation
that the Tinnells['] house would be built for $202,541.00 made both orally and in the two
written contracts." (emphasis added). As asserted in the Tinnells' own brief, they are
contending that Poulson did not perform its contractual obligations. When a claim's essence
is that one party made certain representations that it would perform under the contract and
then failed to do so, the claim is not actionable under the DTPA. Crawford v. Ace Sign, Inc.,
917 S.W.2d 12, 14-15 (Tex. 1996). Moreover, the contract itself was dependent upon the
construction of a home specified in Exhibit A, and the contract provided for written change
orders, a procedure that the parties apparently chose not to follow. At trial, however, the
Tinnells failed to show that Poulson misrepresented that it would build the home specified in
Exhibit A for the agreed price.

 The Tinnells next argue that Poulson engaged in false and deceptive representations
by presenting three different pricing sheets relating to the cost of items used in construction. 
Poulson asserts that the Tinnells waived this argument, and we agree. 

 The Tinnells do not contend they asserted this claim before the trial court or otherwise
demonstrate how they properly preserved that claim for appeal. See Tex. R. App. P. 33.1(a);
Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993) ("As a rule, a claim, including a
constitutional claim, must have been asserted in the trial court in order to be raised on
appeal."). Though we are not required to do so, we have searched the record and find nothing
that shows the Tinnells preserved this claim. (7)
 They did not include the argument in their
petition, did not request a trial amendment to include it, did not mention it during argument
of Poulson's motion for directed verdict, and did not raise it in their motion for new trial. We
find the Tinnells waived their claim that the various "pricing sheets" constituted a deceptive
trade practice.

 As a result, the trial court did not err in granting a directed verdict on the Tinnells'
DTPA claims. We overrule issue six. Having overruled all of the Tinnells' issues and
arguments, we affirm the trial court's judgment.

 AFFIRMED. 

 _______________________________

 HOLLIS HORTON

 Justice


Submitted on August 7, 2007

Opinion Delivered March 6, 2008

Before McKeithen, C.J., Kreger and Horton, JJ.
1. The Tinnells also contend that any ambiguity in the contract should be construed
against Poulson. However, the Tinnells do not contend they preserved this argument for
review on appeal. They provide no record references showing they raised this matter before
the trial court, and they did not include the argument in their motion for new trial. See Tex.
R. App. P. 33.1. Thus, we do not consider this argument. See id. 
2. The trial court adopted Poulson's proposed findings of fact and conclusions of law
in their entirety.
3. During direct examination, Aaron Tinnell contended that he and Laura never
requested any changes or upgrades. On cross-examination, the trial court revisited Aaron's
contention as follows:

 [Court]: And it's your position that any changes that were made was [sic] made
at his own suggestion and not negotiated between you and the
subcontractor. You didn't tell him that you weren't happy with that. 
You never one time went to him and said, well, look, we don't like this,
we need to change this?

 [Aaron]: Never.

 [Court]: Never?

 [Aaron]: We did.

 [Court]: You did? How many times did you do that?

 [Aaron]: Just on the sheetrock texture.

 [Court]: That's the only time? So, all of these other-all of these other changes
on here that he's listed is just his voluntary [sic] deciding to do.

 [Aaron]: Yes, sir. To my knowledge, that was the only time we had an incident,
problem.
4. The trial court's finding regarding Poulson's damages is part of the court's
conclusions of law. We treat this conclusion as a finding of fact. See Ray v. Farmers State
Bank of Hart, 576 S.W.2d 607, 608 n.1 (Tex. 1979).
5. The record is not developed regarding whether the statute in issue requires that the
builder have separate account agreements for each of its customers, or whether money for
various projects may be commingled in a single construction account. See Tex. Prop. Code
Ann. § 162.003 (Vernon 2007). Moreover, pleading the issue of misappropriation of trust
funds would have allowed Poulson to address whether homeowners are within the class of
people that the legislature intended to protect by the statute. See Murphey v. State, 86
S.W.3d 283, 285 (Tex. App.-Amarillo 2002, no pet.).
6. In part, section 17.50(b)(1) allows for awards of not more than three times the amount
of economic damages if the trier of fact finds the defendant knowingly or intentionally 
committed the deceptive acts. Tex. Bus. & Com. Code Ann. § 17.50(b)(1) (Vernon Supp.
2007). 
7. On appeal, the burden is on appellants to direct the appellate court to evidence in the
record supporting their contentions. Hope's Fin. Mgmt. v. Chase Manhattan Mortgage
Corp., 172 S.W.3d 105, 108 (Tex. App.-Dallas 2005, pet. denied); see Fredonia State Bank
v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 283 (Tex. 1994) (stating "it has never been
considered part of an appellate court's duties" to search the record for evidence).